# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

                    Plaintiff,                          **Criminal No. 14-308 (PJS/SER)**

v.

Kevin Max Arballo (1) and                    <u>**REPORT AND RECOMMENDATION**</u>
Ivan Arballo (2),

                    Defendants.

---

James S. Alexander and Thomas Calhoun-Lopez, Esqs., United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Plaintiff.

Philip G. Leavenworth, Esq., Leavenworth Law Office, 182 Star Circle, Vadnais Heights, Minnesota 55127, for Defendant Kevin Max Arballo.

Michael W. McDonald, Esq., 16670 Franklin Trail Southeast, Suite 250, Prior Lake, Minnesota 55372, for Defendant Ivan Arballo.

---

STEVEN E. RAU, United States Magistrate Judge

The above-captioned case comes before the undersigned on Defendant Kevin Max Arballo's ("Kevin Arballo") Motion to Suppress Evidence Acquired by Means of Illegal Search and Seizure [Doc. No. 55] and Supplemental Motion to Suppress Evidence Acquired by Means of Illegal Search and Seizure [Doc. No. 67], and Defendant Ivan Arballo's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 44] (collectively, "Motions to Suppress").[1] This matter has been referred for the resolution of the issues raised in the Motions

---

[1]     At the hearing on the Motions to Suppress, the Court and counsel also discussed Ivan Arballo's Motion for Severance or in the Alternative, to Join the Co-Defendant's Motions ("Motion to Sever or Join") [Doc. No. 45]. (Tr. of Mots. Hr'g Held on Nov. 26, 2014, "Tr.") [Doc. No. 73 at 8]. Ivan Arballo clarified that he sought to join Kevin Arballo's Motion to Suppress Evidence Acquired by Means of Illegal Search and Seizure and Supplemental Motion

to Suppress pursuant to 28 U.S.C. § 636(b)(1)(B)–(C) and District of Minnesota Local Rule 72.1.

For the reasons stated below, this Court recommends denying the Motions to Suppress.

## I.      BACKGROUND

On September 24, 2014, a grand jury indicted Kevin Arballo and Ivan Arballo (collectively "Defendants") with one count of conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846, and one count of possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). (Indictment) [Doc. No. 24 at 1–2].   At a pretrial motions hearing on November 26, 2014, this Court heard testimony from Agent Jeffrey P. Thul ("Agent Thul") and Agent Jeff Hanson ("Agent Hanson"). (Minute Entry Dated Nov. 26, 2014) [Doc. No. 68]; (Ex. & Witness List) [Doc. No. 69]. The Court received into evidence Government's Exhibit 1, a copy of a search warrant issued for the search of Room 145 at the AmericInn in Bloomington, Minnesota, and Defendants' Exhibit 1, a copy of the training log for the drug detection dog that was involved in this case. (Ex. & Witness List).

At the request of the parties, the Court ordered supplemental briefing. (Minute Entry Dated Nov. 26, 2014 at 2). Ivan Arballo submitted his supplemental brief on December 23, 2014, and Kevin Arballo submitted his supplemental brief on December 24, 2014. (Def.'s Mem. of Law, "Mem. in Supp.—Ivan") [Doc. No. 78]; (Def.'s Mem. in Supp. of Mot. to Suppress Evidence Acquired by Means of Illegal Search and Seizure, "Mem. in Supp.—Kevin") [Doc. No. 79]. The Government responded on January 7, 2015. (Gov't's Resp. to Def.'s Mem. in Supp. of

---

to Suppress Evidence Acquired by Means of Illegal Search and Seizure (collectively "Kevin Arballo's Motions to Suppress"). (*Id.*). The Court denied without prejudice Ivan Arballo's Motion to Sever or Join to the extent he sought severance, but granted the motion to the extent he sought to join Kevin Arballo's Motions to Suppress. (Order Dated Dec. 8, 2014) [Doc. No. 71 at 3]. Therefore, the Court's analysis and recommendations regarding Kevin Arballo's Motions to Suppress apply with equal force to Ivan Arballo.

Mot. to Suppress Evidence, "Gov't's Resp.—Kevin") [Doc. No. 83]; (Gov't's Resp. to Def.'s

Mem. in Supp. of Mot. to Suppress Evidence, "Gov't's Resp.—Ivan") [Doc. No. 84].

## II.     FACTS

Prior to the arrest of Kevin Arballo and Ivan Arballo, investigators with the Dakota

County Drug Task Force executed a search warrant of a hotel room in Brooklyn Center,

Minnesota. (Tr. at 17). Clinton Patrick Barton ("Barton") occupied the hotel room. (*Id.*). During

the search, investigators found "[a]pproximately one and a half pounds of methamphetamine."

(*Id.*). Barton revealed to investigators that the methamphetamine was his, and that he had

received the drugs earlier that day from "[t]wo [younger] Hispanic males." (*Id.* at 17–18).

Barton cooperated with law enforcement. (*Id.* at 18).

Law enforcement and Barton developed a plan of cooperation. (*Id.*). This plan "included

[Barton] contacting the individuals" from whom he had received the methamphetamine to set up

a meeting. (*Id.*). At the meeting, Barton could pay the individuals "money that he owed them"

for the methamphetamine he previously obtained, and also obtain "additional

methamphetamine." (*Id.*). Barton owed $19,000 for the methamphetamine he obtained

previously, as the drugs were "fronted." (*Id.* at 19, 33). That is, Barton was provided with drugs

and would pay the individuals after selling the drugs. (*Id.* at 19). Fronting is "a common practice,

especially in larger scale drug deals." (*Id.* at 18–19).

Agent Thul, who is a police officer for the City of Eagan and a detective assigned to the

Dakota County Drug Task Force, worked with Barton. *See* (*id.* at 18, 36). Based on Barton's

description of the individuals from whom he had obtained methamphetamine, Agent Thul

observed similarities between his investigation of Barton's suppliers and a case he had worked

on within the previous month. (*Id.* at 39). The previous case involved two Hispanic individuals,

and an individual that a previous informant referred to as "'the boss.'" (*Id.*). The "boss" resided in Mexico but had "guys up here" in Minnesota. (*Id.*). Likewise, Barton informed Agent Thul he received drugs from two Hispanic individuals in Minnesota and had been "talking to a boss in Mexico." (*Id.* at 18, 39). The similarities were further demonstrated when Barton "provided [Agent Thul] with a phone number for the boss in Mexico and it was the same phone number that the previous informant had given [Agent Thul] for the boss in Mexico on the previous case." (*Id.* at 39). The informant in the previous case told Agent Thul that in past dealings, if he showed up with money, drugs would be provided. (*Id.* at 41). Barton told Agent Thul that he believed that if he showed up to meet the individuals with money, they would give him more drugs because "that's the way it's worked in the past." (*Id.*).

Law enforcement conducted several controlled calls with Barton. (*Id.* at 19). In the first call on August 19, 2014, Barton called one of the individuals from whom he had previously purchased methamphetamine and told the individual that "he just had to collect a little bit more money and that he would be ready to meet with the individuals the following day." *See* (*id.* at 19, 22). The next day, Barton placed another call to the individual. (*Id.* at 20, 22). Barton told the individual that he was in West St. Paul, Minnesota, and stated that he had to pick up "the last little bit of money." (*Id.* at 20). Shortly thereafter, Barton called the individual for a third time and told him that he was "ready to meet." (*Id.*). A meeting at a Menards parking lot in West St. Paul was arranged. (*Id.*). In the phone calls, Barton asked the individual for additional drugs, "claim[ed] he ha[d] raised all the money that he owe[d] for fronted drugs," and at one point told the individual, "your guy," referring to the "boss," said Barton could "get two or three next time." *See* (*id.* at 33, 34). The individual did not make a commitment to bring additional drugs to Barton. (*Id.* at 33).

4

Before the Menards meeting, Barton met law enforcement at a West St. Paul location. (*Id.* at 21). Officers conducted a search of Barton's person and vehicle, "looking for any money, contraband or weapons" and did not find any such items. (*Id.*). Agent Thul provided Barton with "simulated money" to take to the meeting, which was placed in "a manila envelope." (*Id.*). In addition, Barton was equipped with a transmitting device so that agents could hear audio inside Barton's vehicle. (*Id.* at 20–21).

Agent Thul and other law enforcement followed Barton to the Menards parking lot and set up "several vehicles in the area" for surveillance. (*Id.* at 20–21, 23). Barton was parked in the back area of the parking lot and received a call from the individual, who had arrived in the Menards parking lot in a red pickup truck. (*Id.* at 23–24). The individual told Barton that he was in a different area of the parking lot. (*Id.*). Agent Thul heard this information through Barton's audio transmitting device. (*Id.* at 24). Barton drove to the individual's location in the parking lot and parked next to the truck. *See* (*id.*). Agent Thul maintained surveillance of Barton's vehicle, slowly following Barton to the new location in the parking lot. (*Id.*).

A Hispanic male carrying a black duffel bag, later identified as Kevin Arballo, exited the truck. (*Id.* at 24–25, 27). Agent Thul saw Barton park his vehicle and saw Kevin Arballo enter Barton's vehicle. *See* (*id.* at 24). Once in the vehicle, Kevin Arballo asked Barton "how much money [was] in the envelope" and Barton told him it was "all there." (*Id.*). Agent Thul then "signal[ed] for agents to move in and make the arrest" because he "was concerned that [Kevin Arballo would] open up the envelope and realize there was no money in it." (*Id.*). Agents approached the vehicle, ordered Kevin Arballo out of the vehicle, and "he was handcuffed without incident. . . . Barton was . . . arrested at that time to maintain his informant status for the time being." (*Id.* at 25).

5

Agents believed that a second suspect was present, but they had not witnessed another individual exit the truck. (*Id.* at 25, 28). Agents reviewed Menards surveillance video of the encounter, which showed another Hispanic male, later identified as Ivan Arballo, exit the "driver's seat [of the truck] and proceed[] into Menards." (*Id.* at 27–28). The video also showed Kevin Arballo, carrying a black bag, exiting the front passenger seat of the truck, and entering the front passenger seat of Barton's vehicle. (*Id.* at 27). Using video cameras inside Menards, agents located Ivan Arballo near the north exit of the store and placed him under arrest. (*Id.* at 28, 29).

Although the timing is unclear from the evidence submitted to the Court, at some point after Kevin Arballo was apprehended, agents searched Barton's vehicle. (*Id.* at 25).[2] Agent Thul noticed a black duffel bag on the front passenger-side floorboard. (*Id.* at 26). The duffel bag "had not been in the vehicle" when agents searched Barton's vehicle prior to the Menards meeting. (*Id.* at 26, 27). Agent Thul searched the duffel bag, in which he found "a lot of clothes" and "two cellophane wrapped packages of a crystal substance" that was later confirmed to be methamphetamine. (*Id.* at 26).

---

[2]    The precise timing of the search of Barton's vehicle—that is, whether it occurred before or after agents entered Menards to view surveillance video and look for and apprehend Ivan Arballo—is unclear because Agent Thul testified that he did not recall whether the vehicle search occurred before or after agents entered Menards. *See* (*id.*). The search warrant affidavit in this case, which is included in Government's Exhibit 1, appears to recount the relevant facts in chronological order and places the search of Barton's vehicle after the apprehension of Ivan Arballo in Menards. (Gov't Ex. 1 at 4). Kevin Arballo has submitted to the Court various law enforcement reports, some of which seem to place the search of Barton's vehicle before Ivan Arballo's apprehension, and some of which place the search after Ivan Arballo's apprehension. *See* (App. to Mem. in Supp.—Kevin, "App.," Attached to Mem. in Supp.—Kevin) [Doc. No. 79-1 at 5–6, 13–14]. As discussed below, because the information available to agents at the time they apprehended Kevin Arballo (i.e., the earliest point in time when the vehicle search could have occurred), was sufficient to justify the search under both the automobile and search incident to arrest exceptions to the warrant requirement, the uncertainty in the record regarding the precise timing of the search of Barton's vehicle is inconsequential.

Kevin Arballo and Ivan Arballo were transported to the West St. Paul Police Department. (*Id.* at 29). Based on Agent Thul's previous case, he knew it was common for individuals involved in this drug trafficking organization to use hotels in Bloomington, Minnesota. (*Id.*). An agent contacted the Bloomington Police Department and, through its "crime alert system," sent faxes to all Bloomington hotels looking for rooms rented in the name of Kevin Arballo or Ivan Arballo. *See* (*id.* at 29–30). In response, a manager at the AmericInn in Bloomington called Agent Thul and "advised [him] that Ivan Arballo had rented a hotel room at her hotel that day." (*Id.* at 30). The room rented by Ivan Arballo was Room 145. *See* (*id.* at 30, 46).

Agents requested the assistance of Agent Hanson and his canine partner, Marley. *See* (*id.* at 45). Agent Hanson and Marley were asked to conduct a dog sniff at the AmericInn. (*Id.*). After reaching the area surrounding Room 145, Agent Hanson "present[ed] multiple things to [Marley] through a hand gesture," such as "outlets, fire extinguisher boxes, [and] door seams," including the door seam for Room 145. (*Id.* at 45–46). Agent Hanson "present[ed] the door just like . . . all the doors or any other objects" that he wanted Marley to check. (*Id.* at 46). Marley "alerted to the presence of a narcotic" at Room 145. (*Id.*). Agent Hanson testified that Marley's behavior constituted "an absolute alert," as opposed to other behaviors that may demonstrate "interest." (*Id.* at 47).[3]

By the evening of August 20, 2014, agents obtained a state search warrant to search Room 145 at the AmericInn. (*Id.* at 30); (Gov't's Ex. 1). Agent Thul signed the search warrant affidavit and recounted the events that took place in the Menards parking lot earlier that day, including the discovery of methamphetamine in the duffel bag in Barton's vehicle, and described

---

[3] Marley's trained "alert" is to "sit at the source of the odor." (*Id.* at 47). Agent Hanson explained that Marley "went down across the seam of the door" at Room 145 and "immediately sat down." (*Id.*).

Marley's alert outside Room 145. (Gov't's Ex. 1 at 4–5). Agents executed the search warrant and located, among other items, documents in Ivan Arballo's name, a "large amount of U.S. currency, and two packages of methamphetamine," weighing approximately 364 grams and 452 grams respectively. (Aff. of Timothy Fletcher, Attached to Criminal Complaint) [Doc. No. 1 ¶ 16]; *see also* (App. at 22–23).

## III.   DISCUSSION

### A.   Legal Standard

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. Searches "'conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Brown*, 634 F.3d 435, 438 (8th Cir. 2011) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). "One such exception is the automobile exception . . . ." *Id.* The automobile exception "allows law enforcement to search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity." *Id.* (internal quotation marks omitted). Officers may also search "containers within the vehicle whenever probable cause exists." *United States v. Sample*, 136 F.3d 562, 564 (8th Cir. 1998). Probable cause exists when "there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "Probable cause . . . does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *Id.* (internal quotation marks omitted). Whether probable cause exists "at the time of the search is a commonsense, practical

question, to be judged from the totality of the circumstances." *Id.* (internal quotation marks omitted).

Searches incident to arrest provide another exception to the warrant requirement. *United States v. Rousseau*, No. 13-CR-0014 (PJS/FLN), 2013 WL 1788082, at *2 (D. Minn. Apr. 26, 2013). An officer "'who makes a lawful arrest may conduct a warrantless search of the arrestee's person and the area within his immediate control.'" *Id.* (quoting *Davis v. United States*, 131 S. Ct. 2419, 2424 (2011)). Officers may also search an automobile incident to a recent occupant's arrest, but only under certain circumstances. *Id.* Such a search is authorized when: (1) "the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search," or (2) "it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Arizona v. Gant*, 556 U.S. 332, 343 (2009) (internal quotation marks omitted). The offense of arrest may "supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein." *Id.* at 344.

Even if conducted pursuant to a warrant, however, the legality of a search may be subject to challenge. A defendant may challenge the veracity of the affidavit offered in support of probable cause. *See United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999). "To warrant a hearing on the affidavit's veracity, the defendant must make 'a substantial showing that the affidavit contains intentional or reckless false statements and [that] the affidavit, [if] purged of its falsities, would not be sufficient to support a finding of probable cause.'" *Id.* (alterations in original) (quoting *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997)) (citing *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)). The Eighth Circuit has "applied [the] rationale [of *Franks*] to cover material that has been deliberately or recklessly omitted from a search warrant affidavit. *United States v. Jacobs*, 986 F.2d 1231, 1234 (8th Cir. 1993). When

challenging a warrant based on an omission, the defendant must show "'that the police omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading'" and that "'the affidavit[,] if supplemented by the omitted information[,] would not have been sufficient to support a finding of probable cause.'" *Id.* (quoting *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986)).

The substantial showing required for a *Franks* hearing "is not easily made." *United States v. Engler*, 521 F.3d 965, 969 (8th Cir. 2008); *see also United States v. Milton*, 153 F.3d 891, 896 (8th Cir. 1998) ("The 'substantial preliminary showing' requirement needed to obtain a *Franks* hearing is not lightly met."). If a defendant makes the substantial showing necessary to entitle him to a *Franks* hearing, he must then prove his allegations before the Court will suppress evidence. *Jacobs*, 986 F.2d at 1234. If the defendant establishes by a preponderance of the evidence "'the allegation of perjury or reckless disregard'" and, "'with the affidavit's false materials set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.'" *Id.* (quoting *Franks*, 438 U.S. at 155–56).

When an affidavit asserts that a drug dog made a positive alert indicating the presence of narcotics, "the affidavit need only state the dog has been trained and certified to detect drugs" to establish the dog's reliability. *Sundby*, 186 F.3d at 876. The affidavit "need not give a detailed account of the dog's track record or education." *Id.* "Although a search warrant based on a drug dog's alert is facially sufficient if the affidavit states the dog is trained and certified to detect drugs, a court may," consistent with *Franks*, "look behind a search warrant when the affiant intentionally or recklessly misleads the magistrate judge by making an affirmatively false

10

statement or [by omitting] material information that would alter the magistrate judge's probable cause determination." *Id.* (citation and internal quotation marks omitted).

### B.    Analysis

Both Defendants challenge the search of the duffel bag in Barton's vehicle. (Mem. in Supp.—Ivan at 1–3); (Mem. in Supp.—Kevin at 10–13).[4] In addition, Defendants challenge the search warrant issued for AmericInn Room 145 based on the search warrant affidavit's omission of aspects of Marley's training history. (Mem. in Supp.—Ivan at 1); (Mem. in Supp.—Kevin at 13–16). Defendants also contend that in asserting that an arrangement had been made for the purchase of additional methamphetamine, the search warrant affidavit contained inaccurate statements and that those statements, along with the omission of Barton's supplier's non-committal responses to Barton's request for drugs, requires suppression of evidence under *Franks*, or at a minimum, a *Frank's* hearing. *See* (Mem. in Supp.—Ivan at 1, 2); (Def.'s Mot. to Suppress Evidence Acquired by Means of Illegal Search and Seizure at 6). The Court addresses each of these issues in turn.[5]

### 1.    Search of Duffel Bag

---

[4]    At the hearing on the Motions to Suppress, the Court inquired about both Kevin Arballo's and Ivan Arballo's "standing" to challenge the search of the duffel bag located in Barton's vehicle. *See* (Tr. at 56–57). Both Ivan Arballo and Kevin Arballo have asserted standing to challenge the search of the duffel bag. (Mem. in Supp.—Ivan at 1–3); (Mem. in Supp.—Kevin at 7–10). The Government, however, has not addressed the issue. *See generally* (Gov't Resp.—Ivan); (Gov't Resp.—Kevin). Because the Court concludes that the search of the duffel bag was lawful under the automobile exception and as a vehicle search incident to arrest, the Court does not address either defendant's standing to challenge the search. *See United States v. Foster*, 763 F. Supp. 2d 1086 (D. Minn. 2011) (PJS/JJK) (rejecting government's argument that standing is jurisdictional and unwaivable).

[5]    It is unclear, based on his briefing, whether Ivan Arballo contends that the search warrant, on its face, lacked probable cause. *See* (Mem. in Supp.—Ivan at 1). To the extent Ivan Arballo makes this argument, the Court finds it to be without merit. *See* (Gov't's Ex. 1).

11

As noted, both Defendants challenge the search of the duffel bag in Barton's vehicle. (Mem. in Supp.—Ivan at 1–3); (Mem. in Supp.—Kevin at 10–13). In response, the Government contends that the search was lawful under both the automobile and the search incident to arrest exceptions to the warrant requirement. (Gov't Resp.—Ivan at 3–6); (Gov't Resp.—Kevin at 3–6). For the reasons stated below, the Court concludes that the search of the duffel bag was lawful based on both the automobile and the search incident to arrest exceptions.

### a.      Automobile Exception

The automobile exception "allows law enforcement to search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity." *Brown*, 634 F.3d at 438 (internal quotation marks omitted). Here, agents obtained information from Barton, through controlled calls made in their presence, and through surveillance during the Menards meeting; this information provides ample probable cause to believe Barton's vehicle contained evidence of criminal activity.

Assuming that the search of Barton's vehicle and the search of the duffel bag occurred immediately after Kevin Arballo was apprehended and before Ivan Arballo was apprehended, agents had information from Barton that he had been fronted methamphetamine from two Hispanic individuals and that he had been in contact with the individuals' "boss" in Mexico. (Tr. at 17–19, 39). The phone number of the "boss" that Barton had been in contact with was the same as the phone number identified with a "boss" in Mexico in a previous drug-trafficking investigation, in which a different informant told agents that if he showed up to a meeting with money, he would be given drugs. (*Id.* at 39, 41).

Agents also personally observed Barton's phone calls with one of the individuals from whom Barton stated he had previously obtained methamphetamine. (*Id.* at 19–20, 32–33). In

these phone calls, Barton told the individual that he collected all the money he owed, asked for more drugs, and told the individual that his "boss" told Barton that Barton could have more methamphetamine. *See* (*id.* at 33, 40). And while Barton's supplier gave non-committal responses to Barton's requests for additional drugs and never expressly agreed to bring drugs to the Menards meeting, Barton told Agent Thul that he believed that if he showed up to meet the individuals with money, they would give him more drugs because "that's the way it's worked in the past." (*Id.* at 33, 41).

In addition, agents followed Barton to the designated meeting place at the designated time and observed a Hispanic male enter Barton's vehicle. (*Id.* at 23–24). Based on Agent Thul's testimony, the Court finds that Agent Thul observed the Hispanic male, later identified as Kevin Arballo, enter Barton's vehicle carrying a duffel bag. Maintaining surveillance of Barton's vehicle during the Menards meeting, Agent Thul saw Kevin Arballo enter Barton's vehicle, and testified that the duffel bag carried by Kevin Arballo as depicted in the Menards surveillance video was "consistent with the black bag [he] had seen." *See* (*id.* at 24, 27). Finally, through audio surveillance, agents heard Kevin Arballo ask Barton "how much money [was] in the envelope," and Barton told him it was "all there." (*Id.* at 24).

Based on the above totality of the circumstances, the Court concludes that agents had probable cause to believe Barton's vehicle contained evidence of criminal activity. *Cf. United States v. Parish*, 606 F.3d 480, 486–87 (8th Cir. 2010) (finding probable cause where officer spoke to informant in person, listened to phone conversations in which the informant arranged a "drug deal" with the defendant, the informant's description of the defendant's vehicle and the timing and location of the deal were corroborated, and defendant attempted to flee when officers approached his vehicle).

13

Kevin Arballo challenges probable cause based on Barton's reliability. (Mem. in Supp.—Kevin at 12). Kevin Arballo states that "Barton is a convicted felon with no track record at all for reliability in providing assistance to law enforcement." (*Id.*). Kevin Arballo questions the truth of Barton's statement in one of the controlled phone calls to his supplier that the "boss" said Barton could get more methamphetamine, because the call with the "boss" was an "unwitnessed, unauthorized, and unrecorded call [Barton] received" from the "boss." (*Id.*). In addition, Kevin Arballo contends that because Barton is "facing serious prison time for his own crimes," Barton has "every incentive to try and cut his losses," making it "perfectly plausible" that Barton was "improvising and making it up" when he stated that the "boss" said he could get more drugs. (*Id.*). Kevin Arballo asserts that Barton was motivated to lie because it would help him "get a bigger break on his prison sentence" and asserts that Barton is "almost certainly willing to resort to any manner of subterfuge to make this happen." (*Id.*).

Kevin Arballo cites no legal authority in support of his arguments regarding Barton's reliability, *see* (*id.*), and the Court concludes that, applying the proper legal standard, Barton's reliability was sufficiently established in this case. The Government does not dispute Kevin Arballo's assertion that Barton had no track record of providing reliable information to law enforcement. *See generally* (Gov't's Resp.—Ivan); (Gov't's Resp.—Kevin). "However, if an informant is . . . unknown to police and has no proven track record of reliability, police may deem an informant credible and make a finding of probable cause when an informant's information is at least partly corroborated." *United States v. Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013); *see also United States v. Humphreys*, 982 F.2d 254, 259 (8th Cir. 1992) ("[W]here the informants' information is at least partially corroborated, attacks upon credibility and reliability are not crucial to the finding of probable cause."). "Even the corroboration of minor,

innocent details can suffice to establish probable cause." *United States v. Buchanan*, 574 F.3d 554, 562 (8th Cir. 2009) (internal quotation marks omitted).

In determining whether information is reliable, the Eighth Circuit has also noted that "there are indicia of reliability in the richness and detail of a first hand observation" and that "[s]tatements against the penal interest of an informant typically carry considerable weight in establishing reliability." *Id.* at 561–62 (alteration in original) (internal quotation marks omitted). Lastly, "[t]he circumstances of personal questioning may also enhance reliability and credibility," *id.* at 562, as in-person questioning provides law enforcement with an opportunity to "assess the credibility of [a] confidential informant[]." *United States v. Neal*, 528 F.3d 1069, 1074 (8th Cir. 2008).

Here, at least some details of Barton's statements were corroborated through agents' investigation. Barton stated that he had previously obtained methamphetamine from two Hispanic men, and when agents followed Barton to the designated meeting location, at the designated time, agents observed a Hispanic male enter Barton's vehicle. (Tr. at 18, 24). During the controlled phone calls with law enforcement, agents heard Barton and his supplier discuss money that Barton owed, and through audio surveillance heard the Hispanic male ask Barton how much money was in the envelope. (*Id.* at 24, 33). These discussions corroborated, at least in part, Barton's statements that he was fronted the methamphetamine law enforcement had previously seized from him and that he was indebted to his supplier. And "[i]f some information from an informant is shown to be reliable because of corroboration, it is a permissible inference

that other, uncorroborated information is also reliable."[6] *United States v. LaMorie*, 100 F.3d 547, 553 (8th Cir. 1996).

In addition, Barton's information was based on his first-hand observations, and Agent Thul spoke with Barton in person on a number of occasions, giving him the opportunity to assess Barton's credibility. *See* (Tr. at 17–20). Both of these circumstances further establish Barton's reliability and credibility. *See Buchanan*, 574 F.3d at 561–62; *Neal*, 528 F.3d at 1074.

Finally, to the extent Kevin Arballo contends that the Court should deem Barton unreliable because he was motivated to lie about getting approval from the "boss" for additional drugs in order to earn "a bigger break on his prison sentence," the Court is not persuaded. *See* (Mem. in Supp.—Kevin at 12). The information Barton provided about his suppliers was against his penal interest, thereby supporting his credibility. *See Buchanan*, 574 F.3d at 561–62. "'That [an] informant may be . . . promised a 'break' does not eliminate the residual risk and opprobrium of having admitted criminal conduct.'" *LaMorie*, 100 F.3d at 553 (omission in original) (quoting *United States v. Harris*, 403 U.S. 573, 583–84 (1971)) (rejecting magistrate judge's reasoning that "statements were not necessarily against [the source's] penal interest because they could have helped her obtain more lenient treatment from the police and

---

[6]     The Court also notes that "[p]robable cause can be established when information from one informant is consistent with that of a second, independent informant." *Buchanan*, 574 F.3d at 562. The record offers little information about the informant in the previous case Agent Thul was involved in, but it appears that the previous investigation led to an arrest. (Tr. at 41). The information provided by the informant in that case is consistent with information provided by Barton. (*Id.* at 39). And although not elicited in testimony at the hearing on the Motions to Suppress, testimony at Defendants' detention hearing, demonstrates that Barton voluntarily told agents about the call he received from the "boss" before the Menards meeting and that agents examined Barton's cell phone to verify that he "did in fact receive a phone call from the boss in Mexico." *See* (Tr. of Preliminary/Detention Hr'g) [Doc. No. 76 at 8, 18]; *see also* (App. at 55, 65) (including relevant pages of transcript as submitted by Kevin Arballo in support of his Motions to Suppress).

prosecutors," as this reasoning was "squarely foreclosed by the relevant case law"). Indeed, Barton was ultimately indicted for conspiring with Kevin Arballo and Ivan Arballo to distribute methamphetamine, demonstrating that Barton's provision of information regarding his suppliers was against his penal interest. *See* (Indictment at 1). Given the above circumstances, the Court concludes that Barton's information was sufficiently reliable to support probable cause. *Cf. United States v. May*, 440 F. Supp. 2d 1016, 1040–41 (D. Minn. 2006) (RHK/RLE) (concluding officer "reasonably relied upon the information . . . obtained from a cooperating Defendant, because the information was given against the cooperating defendant's own penal interest, and because at least some of his information had been confirmed, independently, by the further investigative efforts of the police").

Defendants also contend that agents lacked probable cause to believe Barton's vehicle contained evidence of criminal activity because there was never an express agreement that additional drugs would be brought to the meeting at Menards. (Mem. in Supp.—Ivan at 1); (Mem. in Supp.—Kevin at 11–12). Specifically, Kevin Arballo argues that because during the phone calls Barton's supplier only said, "'We'll talk about that tomorrow' and 'I'll have to check with the boss first' in response to . . . Barton's request for drugs," agents were "left only with the possibility, and no more than that, that drugs might show up at the Menards meeting." (Mem. in Supp.—Kevin at 12) (referring to Appendix at 4 and 13, which contains a Drug Enforcement Administration report and Dakota County Drug Task Force report documenting controlled calls); *see also* (Tr. at 33–34) (discussing content of conversations that took place during controlled calls).

This argument is not persuasive. The argument ignores the information provided by Barton, who the Court has already found reliable, that the individual Barton spoke with on the

17

phone had fronted him drugs earlier and that Barton anticipated being fronted additional drugs at the Menards meeting. *See* (Tr. at 18–19, 41–42). In addition, when determining probable cause, the Court must consider an agent's "training and experience and give 'due weight' to any inferences" drawn from the facts in light of that experience. *United States v. Valle Cruz*, 452 F.3d 698, 703 (8th Cir. 2006) (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). Here, Agent Thul, an agent with the Dakota County Drug Task Force, testified that the fronting of drugs is "common practice, especially in larger scale drug deals." (Tr. at 17, 18–19). And, with regard to the non-committal responses Barton was given when he asked for more drugs and stated that the "boss" approved of his receipt of more drugs, Agent Thul testified that in his "experience . . . on multiple buys [he has] set up, somebody suggests, I've got the money, let's meet up. They meet up, they do the deal." (*Id.* at 43). He further explained that "[p]eople are fairly cautious about what they say on the phone a lot of times because they think police might be listening." (*Id.*). Despite the non-committal responses of Barton's supplier, when considered through the lens of an officer's training and experience, the information provided by Barton, obtained through the controlled calls, and through observations during the Menards meeting, including Agent Thul's observation of Kevin Arballo entering Barton's vehicle with a duffel bag, provided probable cause to believe that Barton's vehicle contained evidence of criminal activity.[7]

---

[7]        Kevin Arballo seems to suggest that the training and experience of law enforcement is irrelevant here because "any . . . pattern law enforcement has identified" with regard to "drug suppliers automatically show[ing] up with drugs at every meeting" has not involved Kevin Arballo or Ivan Arballo. (Mem. in Supp.—Kevin at 12–13). This position is at odds with the principle that probable cause is a "flexible" and "'fluid concept'" that requires only a "'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'" *Florida v. Harris*, 133 S. Ct. 1050, 1055–56 (2013) (quoting *Gates*, 462 U.S. at 231, 232, 238). It also ignores the principle that the general training and experience of law enforcement officers is relevant because "[s]ome police, particularly those assigned to specialized areas of enforcement, become familiar with the methods of those engaged in particular types of criminal activity." 2 Wayne R. LaFave, *Search & Seizure* § 3.2(c) (5th ed. 2014). In addition, while it is true that

Defendants suggest that probable cause was lacking in this case because the duffel bag that agents saw Kevin Arballo carrying into Barton's vehicle was "perfect for picking up the sum of $19,000 that Agent Thul conceded at [the] hearing would comprise a physically hefty sum" and that "[p]resumably, the bag was utilized to pick up cash on a debt to be paid." (Mem. in Supp.—Kevin at 11); (Mem. in Supp.—Ivan at 2). That is, the Defendants seem to contend that the only reasonable inference to be made from the fact that Kevin Arballo carried a duffel bag into Barton's vehicle was that he brought the duffel bag to hold the sum of money Barton had promised to pay. Defendants' argument for such a limited inference is inconsistent with the practical, totality of the circumstances analysis the Court must undertake in determining probable cause.

Agent Thul did agree that $19,000 is a "hefty sum of cash." *See* (Tr. at 33). But when asked whether the duffel bag "would be perfect for carrying that cash," Agent Thul stated that the sum "would have . . . fit in th[e] bag" but also noted that the simulated money—intended to simulate the $19,000 Barton owed to his supplier—fit "in a manila envelope." (*Id.* at 33–34). Because the simulated money fit into a manila envelope, the duffel bag brought to the Menards meeting, which was large enough to fit "a lot of clothes" and "two cellophane wrapped packages" of methamphetamine, was not "perfect" for carrying the money that Barton stated he would bring to the meeting. (*Id.* at 26). "In making a probable cause determination, [l]aw enforcement officers have substantial latitude in interpreting and drawing inferences from

---

Agent Thul testified that Defendants were not connected to the previous similar investigation, previous investigation did have similarities to the investigation that led to the arrest of Defendants, including the fact that Barton "provided [Agent Thul] with a phone number for the boss in Mexico" that was the same phone number that the previous informant had given Agent Thul "for the boss in Mexico on the previous case." (Tr. at 39–40).

factual circumstances." *Winarske*, 715 F.3d at 1067. Here, it was entirely reasonable, under the totality of the circumstances, for agents to infer the duffel bag contained narcotics.

Because the Court concludes that, under the totality of the circumstances, there was probable cause for agents to believe that Barton's vehicle contained evidence of criminal activity, the warrantless search of Barton's vehicle and any containers therein was authorized under the automobile exception. *See Sample*, 136 F.3d at 564.

**b.    Search Incident to Arrest Exception**

The search of the duffel bag in this case was also justified as a vehicle search incident to arrest. Agent Thul testified that before Barton's vehicle was searched, Kevin Arballo was ordered out of the vehicle, "placed on the ground," handcuffed, and placed under arrest. (Tr. at 25, 31). Defendants do not dispute that Kevin Arballo was lawfully under arrest at the time of the search of Barton's vehicle, nor does the record support any other conclusion. *See generally* (Mem. in Supp.—Ivan); (Mem. in Supp.—Kevin). The other factual circumstances relevant to this inquiry are thoroughly discussed above.

For reasons similar to those discussed with regard to the applicability of the automobile exception, it was "reasonable to believe evidence relevant to the crime of arrest might be found in [Barton's] vehicle." *Gant*, 556 U.S. at 343 (internal quotation marks omitted). Kevin Arballo speculates as to the offense of arrest at the time of the search of Barton's vehicle, and it is unclear from the record currently before the Court what the actual, intended offense of arrest was at the time of the search of Barton's vehicle. *See* (Mem. in Supp.—Kevin at 10–11). Justice Scalia's concurrence in *Gant*, however, suggests that "a vehicle search incident to arrest is *ipso facto* 'reasonable' only when the object of the search is evidence of the crime for which the arrest was made, or of another crime that the officer has probable cause to believe occurred." 556

U.S. at 353; *see also United States v. Edwards*, 769 F.3d 509, 515 (7th Cir. 2014) ("*Gant* did not indicate whether the 'offense of arrest' is limited to the crime for which the defendant was 'actually arrested' or includes other crimes that the officer had probable cause to believe occurred. Justice Scalia's concurrence in *Gant* suggests both would qualify."); *Rousseau*, 2013 WL 1788082, at *3 (analyzing applicability of search incident to arrest exception to search of defendant's vehicle based on offense of arrest by considering what offenses "police had probable cause to believe" defendant committed).

In light of the facts and circumstances discussed above, the Court concludes that agents had, at a minimum, probable cause to believe the individual that entered Barton's vehicle carrying a duffel bag was a participant in a conspiracy to distribute methamphetamine. Those same facts and circumstances made it reasonable for agents to believe that Barton's vehicle contained evidence relevant to the conspiracy. As a result, a search of Barton's vehicle and any containers therein was a lawful search incident to arrest. *See Gant*, 556 U.S. at 343–44.

## 2.   Search Warrant

### a.   Dog Sniff at AmericInn Room 145

Defendants challenge the search warrant based on the dog sniff at AmericInn Room 145. Kevin Arballo contends that, based on evidence regarding Marley's track record that was omitted from the search warrant affidavit, "he has made the substantial showing of reckless disregard as required for a *Franks* hearing." (Mem. in Supp.—Kevin at 15). Ivan Arballo asserts that because "[e]vidence adduced at the suppression hearing established [that Marley] falsely alerted on several occasions prior to the search at the Americ Inn on August 20, 2014," including two false alerts on August 12, 2014, "the results of the dog sniff outside Room 145 are not reliable and do not establish a basis for probable cause to search." (Mem. in Supp.—Ivan at 1); *see also* (*id.* at

2). Unlike Kevin Arballo, Ivan Arballo does not argue that information related to Marley's track record constitutes the substantial showing required for a *Franks* hearing, but appears to contend that this information entitles him to **suppression** of evidence under *Franks*. *See* (Mem. in Supp.—Ivan at 3) (citing to an Eighth Circuit case addressing suppression under *Franks*). The Court concludes that Defendants have failed to establish the substantial showing necessary for a *Franks* hearing, let alone a *Franks* violation requiring the suppression of evidence.[8]

Kevin Arballo appears to challenge the facial validity of the search warrant affidavit with regard to Marley's reliability, arguing that "while the warrant application sets forth some of the dog's qualifications, there is no discussion of ongoing training undertaken after certification to keep the dog's skills sharp." (Def.'s Mot. to Suppress Evidence Acquired by Means of Illegal Search and Seizure at 8). But the search warrant affidavit states that Agent Hanson and Marley

> are a certified police narcotics detecting canine team so recognized by the United States Police Canine Association, at the regional level. Agent Hanson and . . . Marley have in excess of 200 hours of training and are certified to alert to the odor of various narcotics including . . . Methamphetamine . . . .

(Gov't's Ex. 1 at 5). The affidavit also states that Marley "check[ed] the area in the . . . hallway [at the AmericInn] that included several doors on the first floor for the presence of a narcotic

---

[8] Beyond their challenge to Marley's reliability based Marley's training record, Defendants do not challenge any other circumstances related to the dog sniff conducted at the AmericInn. *See* (Mem. in Supp.—Ivan at 1) (referring only to Marley's previous false alerts when arguing that the "dog sniff outside Room 145 [was] not reliable"); (Mem. in Supp.—Kevin at 13) ("Defendant does not challenge the canine team of Agent Hanson and Marley insofar as the sniff activities at AmericInn.").

The Court notes that at the hearing on the Motions to Suppress, the Court permitted Defendants to call Agent Hanson to inquire into the circumstances of the dog sniff and Marley's training history, and received into evidence Marley's training log. (Tr. at 45–55). In doing so, the Court permitted Defendants to explore issues related to the reliability of the dog sniff, but did not making a ruling on whether Defendants had made the substantial showing required for a *Franks* hearing. *See* (*id.* at 12–13); *see also United States v. Scott*, 610 F.3d 1009, 1013–14 (8th Cir. 2010) (reviewing district court's denial of *Franks* hearing after officer testified at suppression hearing about dog's reliability and past false alert).

odor" and that Marley "alerted to the presence of a narcotic odor at the threshold of . . . Room #145." (*Id.*). This information plainly demonstrates that the warrant "is facially sufficient." *Sundby*, 186 F.3d at 876; *see also id.* (finding warrant facially sufficient when "the affidavit supporting the search warrant stated the dog and his handler are certified by the United States Police Canine Association, the dog is trained and certified in the detection of certain illegal drugs, and the dog was exposed to several packages at the same time and indicated [defendant's] package contained contraband"). The Court must therefore consider whether, despite its facial validity, Defendants have made the substantial showing required to warrant a *Franks* hearing on the affidavit's veracity. *Id.*

Kevin Arballo contends "that Marley has had a number of troubling days over the span of late 2012 through August 12, 2014," and that "this information should have been included in the search warrant application." (Mem. in Supp.—Kevin at 13). On this basis, he contends that he has made the substantial showing necessary for a *Franks* hearing. (*Id.* at 15). The Court is not persuaded.

According to Kevin Arballo the log contains "nine entries" that document "days with false alerts or where a problem of some magnitude is otherwise mentioned." (*Id.* at 14). From November 26, 2012, to August 20, 2014 (the date of the sniff outside AmericInn Room 145), Marley's training log shows that he falsely alerted seven times. *See generally* (Defs.' Ex. 1). Kevin Arballo does not specify what other "problem[s] of some magnitude" he refers to, though the Court assumes he is referring to matters such as "leash controll [sic] issues" and one day where Marley "looked sloppy on cars." (*Id.* at 3); (Mem. in Supp.—Kevin at 14). Even assuming that other training issues beyond false alerts are relevant to Marley's reliability, the Court

concludes that Defendants have failed to make the substantial preliminary showing required for a *Franks* hearing.

First, nothing in the record suggests that in failing to include Marley's prior false alerts or other training issues, "'police omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading.'" *Jacobs*, 986 F.2d at 1234 (quoting *Reivich*, 793 F.2d at 961). Even assuming, however, that this information was intentionally or recklessly omitted from the search warrant affidavit, "'[s]uch a finding alone is legally insufficient to justify a *Franks* hearing absent a determination that the intentionally or recklessly omitted information may have . . . otherwise made a probable cause finding unsupportable.'" *Scott*, 610 F.3d at 1013 (quoting *United States v. Williams*, 477 F.3d 554, 558 (8th Cir. 2007)).

Considering the affidavit as if it were supplemented by the omitted information, the Court concludes that there would have remained ample probable cause for the search of AmericInn Room 145. While it is true that Marley's training log shows seven false alerts, including two that occurred eight days before Marley's sniff in this case, the majority of the false alerts—four out of seven—occurred in late December 2012 and early January 2013. *See* (Defs.' Ex. 1 at 2). These false alerts appear to be early in Marley's drug-dog career, and precede the sniff in this case by well over a year. *Cf. Scott*, 610 F.3d at 1014 (noting that dog's false positive alert occurred when he was "young and newly certified as a drug detection dog"). In addition, of the over sixty training or field-work entries documented before the sniff in this case, only seven false alerts are documented along with one entry reflecting a day on which Marley had leash control issues and another day where Marley was "sloppy on cars." *See generally* (Defs.' Ex. 1).

Given the relatively small number of false alerts, the *de minimus* number and nature of the other "problem" entries alluded to by Kevin Arballo, and the remaining information in the

search warrant affidavit, none of which the Court recommends be excluded from the warrant as derived from an illegal search or seizure, the Court is satisfied that the omitted information would not have significantly altered the issuing court's assessment of Marley's reliability or the issuing court's ultimate finding of probable cause. *Cf. Scott*, 610 F.3d at 1014 ("Given [the dog]'s overall accuracy record and the additional information in [the search warrant] affidavit regarding [the defendant's] drug distribution, the information regarding [the dog]'s one false positive would not have altered the probable cause finding."); *Donnelly*, 475 F.3d at 955 (concluding that dog's in-field accuracy rate of fifty-four percent, considered in light of the totality of the circumstances, was sufficient to establish probable cause); *Kennedy*, 131 F.3d at 1378 ("The evidence indicated that [the dog] correctly alerted 71% of the time in those instances where records were kept and that on those occasions where [the dog] worked with Small, the dog had at least an 80% accuracy rate. We find that a 70–80% success rate meets the liberal standard for probable cause established in *Gates*.").

Kevin Arballo cites *Jacobs*, 986 F.2d 1231, in support of his contention that he is entitled to a *Franks* hearing based on omissions regarding Marley's track record. (Mem. in Supp.—Kevin at 14). *Jacobs* is distinguishable. In *Jacobs*, officers conducted a canine sniff of several packages, including a suspicious package addressed to the defendant. 986 F.2d at 1233. The drug dog "showed an interest in the defendant's package by pushing it around with his nose and scratching it twice," but did not "official[ly] 'alert' . . . so the dog's handler was not sure that the package contained drugs." *Id.* The court concluded that the defendant had established a *Frank's* violation because the affiant "informed the magistrate judge that the dog had shown an interest in the . . . package, but neglected to include [the fact] that no alert had occurred." *Id.* at 1234. "Unlike the dog in *Jacobs*," Marley "unequivocally alerted" at the threshold of AmericInn Room

25

145. *See Scott*, 610 F.3d at 1014 (distinguishing *Jacobs*); *see also* (Tr. at 47) (Agent Hanson's testimony that Marley's behavior constituted "an absolute alert"). The omission of seven false alerts over Marley's approximately two year career, most of which occurred during Marley's first months in training and all of which occurred during "unrelated incident[s]," is "entirely distinguishable from the omission of a failure to alert on the very property to be searched." *See Scott*, 610 F.3d at 1014; *see also United States v. Holleman*, 743 F.3d 1152, 1156 (8th Cir. 2014) (distinguishing *Jacobs* and noting that "[t]he whole point of *Jacobs* was the distinction between a drug dog's mere 'interest' and a dog giving a 'full alert' to a package").

Kevin Arballo also cites *Commonwealth v. Ramos*, 894 N.E.2d 611 (Mass. App. Ct. 2008), in support of his argument that the omission of Marley's prior false alerts warrants a *Franks* hearing in this case. (Mem. in Supp.—Kevin at 15).[9] *Ramos* is both non-binding authority and easily distinguishable. *Ramos* involved not only the omission of the drug dog's false alerts but also a false statement that the dog had "accumulated 'over 150 documented finds' leading to the seizure of narcotics and the arrest of dealers," when in fact the dog had "detected drugs . . . on only five or six occasions; and . . . all other alerts or hits had occurred in training exercises." *Ramos*, 894 N.E.2d at 613. The court's analysis in *Ramos* is unpersuasive here, and consistent with Eighth Circuit authority, the Court concludes that Defendants have failed to make the substantial showing required for a *Franks* hearing.

Finally, to the extent Ivan Arballo seeks suppression rather than a *Franks* hearing based on the omission of specific facts regarding Marley's track record, his argument necessarily fails. Because the Court concludes that such omissions do not give rise to the substantial showing

---

[9]    A copy of the *Ramos* decision is included in the Appendix attached to Kevin Arballo's Memorandum in Support. (App. at 106–13).

necessary for entitlement to a *Franks* hearing, the same omissions do not establish grounds for suppression under *Franks*.

          **b.**      **Arrangement to Purchase Additional Methamphetamine and Non-Committal Responses**

Defendants contend that in asserting that an arrangement had been made for the purchase of additional methamphetamine, the search warrant affidavit contained inaccurate statements and that those statements, along with the omission of Barton's supplier's non-committal responses to Barton's request for drugs, require suppression of evidence under *Franks*, or at a minimum, a *Franks* hearing. *See* (Mem. in Supp.—Ivan at 1, 2); (Def.'s Mot. to Suppress Evidence Acquired by Means of Illegal Search and Seizure at 6). The Court addresses each of these issues in turn.

As noted, before a defendant is entitled to a hearing on the "affidavit's veracity, the defendant must make 'a substantial showing that the affidavit contains intentional or reckless false statements and [that] the affidavit, [if] purged of its falsities, would not be sufficient to support a finding of probable cause.'" *Sundby*, 186 F.3d at 876 (alterations in original) (quoting *Kennedy*, 131 F.3d at 1376) (citing *Franks*, 438 U.S. at 155–56). Defendants have failed to make a substantial showing.

> To show reckless disregard for the truth, [the Court does] not look simply at whether a statement included in the affidavit was true; rather, [the Court] ask[s] whether, when looking at all the evidence available to the officer, the officer 'must have entertained serious doubts as to the truth of his [or her] statements or had obvious reasons to doubt the accuracy of the information he [or she] reported.

*Neal*, 528 F.3d at 1072 (alterations in original) (quoting *United States v. Schmitz*, 181 F.3d 981, 986–87 (8th Cir. 1999)). For the same reasons discussed above in Part III.B.1.a., with regard to whether agents had probable cause to believe that Barton's vehicle contained evidence of criminal activity, the Court cannot find any substantial showing, when looking at all the evidence available to Agent Thul, that Agent Thul must have entertained serious doubts as to the truth of

his statements or had obvious reasons to doubt the accuracy of the information he reported in the search warrant affidavit. *See id.* Nor can the Court find a substantial showing that Agent Thul omitted Barton's supplier's non-committal responses "with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading.'" *Jacobs*, 986 F.2d at 1234 (quoting *Reivich*, 793 F.2d at 961); *see also id.* at 1235 (stating that "the failure to include . . . information and a reckless disregard for its consequences may be inferred from the fact that the information was omitted, but that "in order for this inference to be valid, the defendant must show that the omitted material would be clearly critical to the finding of probable cause" (internal quotation marks omitted)).

And given the other facts reported in the warrant, the Court also finds that the affidavit, even if purged of the statement that Barton "arranged to purchase several pounds of methamphetamine," and with Barton's supplier's non-committal responses included, would nonetheless be sufficient to support a finding of probable cause. *See* (Gov't's Ex. 1). Accordingly, the Court concludes that the alleged false statements and omissions require neither a hearing nor suppression of evidence under *Franks*.[10]

---

[10]      In arguing that the search warrant for Room 145 lacked probable cause, Ivan Arballo also argues that "[t]he good faith exception to the exclusionary rule as set forth in *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405 (1984) does not apply in this case." (Mem. in Supp.—Ivan at 2). Under *Leon*, even if a search warrant lacks probable cause, evidence seized pursuant to a search warrant is admissible if it was objectively reasonable for the officers executing the search warrant to have relied in good faith on the validity of the search warrant. *United States v. Carpenter*, 341 F.3d 666, 669 (8th Cir. 2003) (citing *Leon*, 468 U.S. at 922–23). The *Leon* "good faith exception," however, does not apply in certain circumstances. *Id.* Because the Court rejects Defendants' challenges to probable cause based on Marley's reliability and based on the Defendants' premise that evidence obtained from the search of the duffel bag should be suppressed, the Court does not conduct a separate analysis of whether the good-faith exception applies. *See Leon*, 468 U.S. at 922–23.

The Court also notes that Kevin Arballo has addressed a request for severance made at the motions hearing. (Mem. in Supp.—Kevin at 16). The Court has already denied without prejudice Ivan Arballo's request for severance. (Order Dated Dec. 8, 2014 at 3). Having provided

## IV.     RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Defendant Kevin Max Arballo's Motion to Suppress Evidence Acquired by Means of Illegal Search and Seizure [Doc. No. 55] and Supplemental Motion to Suppress Evidence Acquired by Means of Illegal Search and Seizure [Doc. No. 67] be **DENIED**; and,

2.      Defendant Ivan Arballo's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 44] be **DENIED**.

Dated: February 6, 2015

                                        _s/Steven E. Rau_____
                                        Steven E. Rau
                                        United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **February 20, 2015**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.

---

no new argument or information since the motions hearing, *see* (*id.*), the Court also denies without prejudice Kevin Arballo's request for severance.